[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | |
|---|---|
| FALL LINE PATENTS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DOORDASH, INC., *et al.*<br><br>Defendants. | CIVIL ACTION NO. 5:24-cv-179-RWS<br><br>**JURY TRIAL DEMANDED** |

**FALL LINE'S OMNIBUS MOTION FOR A NEW TRIAL AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON ENABLEMENT**

[redacted]

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 4

A. Fall Line Moves To Compel Location Sharing And Precise Location Data ..... 4

B. One New Column Is Ordered, Yet Four More Arrive With It ..... 5

C. Two Weeks Before Trial, DoorDash Puts Its Tables Into A Fresh Exhibit ..... 7

D. DoorDash Argues Concealment, And Fall Line's Answer Is Excluded ..... 9

E. The Court Bars Using Mr. Rowan's Personal Testimony ..... 9

F. DoorDash Builds Its "Customized" Case On Mr. Rowan's Personal Opinions ..... 10

G. DoorDash Asserts Lack Of Enablement But Calls No Witness To Prove It ..... 11

H. The Jury Renders Its Verdict ..... 12

III. FALL LINE'S MOTION FOR A NEW TRIAL UNDER RULE 59 ..... 12

A. Rule 59 Asks Whether The Trial Was Fair, And This General Verdict Leaves No Way To Say It Was ..... 12

B. The Improper Admission Of DX-209 Warrants A New Trial ..... 13

1. DX-209 was improperly admitted under the business-records exception ..... 13

a. DX-209 was hearsay, so DoorDash had to prove an exception ..... 13

b. Even though Fall Line's objection was overruled, that did not prove the exception ..... 14

c. DoorDash did not show that DX-209 met the business-records exception ..... 15

d. Worse, DoorDash's admissions refuted the business-records exception ..... 18

2. DoorDash used DX-209 to urge the jury to disbelieve Fall Line entirely, so its admission was prejudicial ..... 19

a. An error is prejudicial unless the Court can be sure that it did not influence the verdict, including how the jury evaluated the evidence of infringement ..... 19

[redacted]


b. Because DoorDash repeatedly used DX-209 to attack Fall Line's credibility—using a heading no witness could vouch for—its admission prejudiced Fall Line ..... 21

c. The prejudice was compounded because Fall Line was barred from responding to DoorDash's concealment narrative ..... 26

3. Fall Line preserved its objection to DX-209 ..... 27

C. The Improper Admission Of Mr. Rowan's "Customized" Testimony Warrants A New Trial ..... 28

1. Mr. Rowan's testimony about "customized for a particular location" was improperly admitted ..... 28

a. The Court precluded DoorDash's use of Mr. Rowan's Rule 30(b)(1) testimony ..... 28

b. Mr. Rowan's "customized" exchange was Rule 30(b)(1) testimony ..... 29

c. Even if the exchange were Rule 30(b)(6) testimony, it still contradicted the Court's claim construction and was an improper lay opinion ..... 31

2. Admitting Rowan's "customized" testimony was prejudicial, and DoorDash's closing made sure of it ..... 34

3. Fall Line preserved its objections to Mr. Rowan's "customized" testimony ..... 37

D. DoorDash Attacked Fall Line's Credibility In Other Improper Ways ..... 38

IV. FALL LINE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON ENABLEMENT UNDER RULE 50(b) ..... 40

A. Judgment As A Matter Of Law Is Required When No Reasonable Jury Could Find Invalidity, Even If The Jury Did Not Reach That Question ..... 40

B. No Reasonable Jury Could Find That DoorDash Proved Its Enablement Defense By Clear And Convincing Evidence ..... 41

V. CONCLUSION ..... 46

[redacted]

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023) ........ 42

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ........ 44

*Baxter Healthcare Corp. v. Spectramed, Inc.*,
49 F.3d 1575 (Fed. Cir. 1995) ........ 41

*Bernhardt v. Richardson-Merrell, Inc.*,
892 F.2d 440 (5th Cir. 1990) ........ 14

*Bourjaily v. United States*,
483 U.S. 171 (1987) ........ 15

*Braun v. Flynt*, 731 F.2d 1205
(5th Cir. 1984) ........ 13

*Broad. Music, Inc. v. Xanthas, Inc.*,
855 F.2d 233 (5th Cir. 1988) ........ 19

*Cephalon, Inc. v. Watson Pharms., Inc.*,
707 F.3d 1330 (Fed. Cir. 2013) ........ 42, 44

*Cirba Inc. v. VMware, Inc.*,
No. 19-742-LPS, 2020 WL 7489765 (D. Del. Dec. 21, 2020) ........ 20, 24

*Clapper v. American Realty Investors, Inc.*,
95 F.4th 309 (5th Cir. 2024) ........ 38, 40

*Commil USA, LLC v. Cisco Sys., Inc.*,
720 F.3d 1361 (Fed. Cir. 2013), *vacated in part on other grounds*,
575 U.S. 632 (2015) ........ 38

*Conway v. Chem. Leaman Tank Lines, Inc.*,
525 F.2d 927 (5th Cir. 1976) ........ 20

*Cruz v. Cervantez*,
96 F.4th 806 (5th Cir. 2024) ........ 13, 20, 28, 38

*Davidson Oil Country Supply Co. v. Klockner, Inc.*,
917 F.2d 185 (5th Cir. 1990) ........ 21

*Dell Computer Corp. v. Rodriguez*,
390 F.3d 377 (5th Cir. 2004) ........ 38

*Edwards v. Sears, Roebuck & Co.*,
512 F.2d 276 (5th Cir. 1975) ........ 20

[redacted]

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009)....................32, 38

*Goodyear Tire & Rubber Co. v. CEVA Logistics Singapore, Ltd.*,
348 F.R.D. 54 (E.D. La. 2024)....................30

*Hager v. Brinker Tex., Inc.*,
102 F.4th 692 (5th Cir. 2024)....................2, 16, 19

*Hebert v. Lisle Corp.*,
99 F.3d 1109 (Fed. Cir. 1996)....................41

*Hoffman v. Palmer*,
129 F.2d 976 (2d Cir. 1942), *aff'd*, 318 U.S. 109 (1943)....................19

*Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*,
772 F.3d 1031 (5th Cir. 2014)....................23

*HVLPO2, LLC v. Oxygen Frog, LLC*,
949 F.3d 685 (Fed. Cir. 2020)....................33, 37

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*,
26 F.4th 256 (5th Cir. 2022)....................34

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988)....................42

*Intellectual Ventures I LLC v. Canon Inc.*,
104 F. Supp. 3d 629 (D. Del. 2015)....................37

*Jauch v. Corley*,
830 F.2d 47 (5th Cir. 1987)....................35

*Kelly v. Boeing Petroleum Servs., Inc.*,
61 F.3d 350 (5th Cir. 1995)....................13

*Kilchrist v. Sika Corp.*,
No. 3:10-CV-2567-B, 2012 WL 3599383 (N.D. Tex. Aug. 22, 2012),
*aff'd*, 555 F. App'x 350 (5th Cir. 2014)....................41

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004)....................43, 44

*Laitram Corp. v. NEC Corp.*,
115 F.3d 947 (Fed. Cir. 1997)....................41

*Latiolais v. Whitley*,
93 F.3d 205 (5th Cir. 1996)....................21, 24

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209 (Fed. Cir. 2006)....................32

*Magēmā Tech. LLC v. Phillips 66 Co.*,
153 F.4th 1248 (Fed. Cir. 2025).................... *passim*

*Mathis v. Exxon Corp.*,
302 F.3d 448 (5th Cir. 2002)....................38

[redacted]

*Maxell, Ltd. v. Samsung Elecs. Co.*,
805 F. Supp. 3d 749 (E.D. Tex. 2025) .......... 12

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009) .......... 19

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) .......... 42

*Mondis Tech. Ltd. v. LG Elecs. Inc.*,
149 F.4th 1291 (Fed. Cir. 2025) .......... 44, 45

*Muth v. Ford Motor Co.*,
461 F.3d 557 (5th Cir. 2006) .......... 13, 40

*Network-1 Techs., Inc. v. Hewlett-Packard Co.*,
981 F.3d 1015 (Fed. Cir. 2020) .......... 35

*Palmer v. Hoffman*,
318 U.S. 109 (1943) .......... 19

*Sowders v. TIC United Corp.*,
No. SA-05-CA-309-OG, 2007 WL 3171797 (W.D. Tex. Aug. 15, 2007) .......... 15

*SSL Servs., LLC v. Citrix Sys., Inc.*,
940 F. Supp. 2d 480 (E.D. Tex. 2013) .......... 34

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
665 F.3d 1269 (Fed. Cir. 2012) .......... 41

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
550 F.3d 1356 (Fed. Cir. 2008) .......... 34

*Swearingen v. Gillar Home Health Care, L.P.*,
759 F. App'x 322 (5th Cir. 2019) .......... 21, 24, 35

*Trs. of Boston Univ. v. Everlight Elecs. Co.*,
896 F.3d 1357 (Fed. Cir. 2018) .......... 41

*Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*,
127 F.4th 1340 (Fed. Cir. 2025) .......... 32

*U.S. Commodity Futures Trading Comm'n v. Dizona*,
594 F.3d 408 (5th Cir. 2010) .......... 15, 18

*Ultravision Techs., LLC v. GoVision LLC*,
No. 2:18-CV-100-JRG-RSP, 2021 WL 2144788 (E.D. Tex. May 26, 2021) .......... 32

*United States v. Brown*,
553 F.3d 768 (5th Cir. 2008) .......... 17

*United States v. Marshall*,
762 F.2d 419 (5th Cir. 1985) .......... 28

*United States v. Rodriguez-Leos*,
953 F.3d 320 (5th Cir. 2020) .......... 38

[redacted]

*VirnetX Inc. v. Apple Inc.*,
No. 6:12-CV-855, 2016 WL 4063802 (E.D. Tex. July 29, 2016) ....20, 23

*Whitehead v. Food Max of Miss., Inc.*,
163 F.3d 265 (5th Cir. 1998) ....38

**Statutes**

35 U.S.C. § 112 ....45

35 U.S.C. § 282 ....42

**Rules**

Fed. R. Civ. P. 32(a) ....24, 35

Fed. R. Civ. P. 32(a)(1)(B) ....34

Fed. R. Civ. P. 32(a)(5)(A) ....2, 10, 29, 31

Fed. R. Civ. P. 50(a) ....40, 42, 43, 44

Fed. R. Civ. P. 50(b) ....40, 41

Fed. R. Civ. P. 59 ....4, 12

Fed. R. Civ. P. 61 ....20

Fed. R. Evid. 103(a) ....13, 20, 22, 27, 28

Fed. R. Evid. 103(b) ....38

Fed. R. Evid. 701(c) ....37

Fed. R. Evid. 702 ....32, 34, 37

Fed. R. Evid. 802 ....14

Fed. R. Evid. 803(6) ....15, 16, 17, 18

**Other Authorities**

Fed. R. Civ. P. 32 advisory committee's note to 1993 amendment ....31

[redacted]

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| "Dkt." | The docket in this member case, *Fall Line Patents, LLC v. DoorDash, Inc.*, No. 5:24-cv-179-RWS |
| "Lead Dkt." | The docket in the lead consolidated case, *Fall Line Patents, LLC v. 7-Eleven, Inc.*, No. 5:24-cv-167-RWS |
| "Vol. 1"–"Vol. 4" | Transcripts of the jury trial held July 27–30, 2026, filed at Dkt. 73, 75, 77, and 78, respectively (cited by volume and page:line) |
| "7/16/26 Hr'g Tr." | Transcript of the July 16, 2026 Pre-Trial Conference, filed at Lead Dkt. 495 |
| "Ex. 1"–"Ex. 3" | Exhibits to this motion: July 13, 2026 email from DoorDash's counsel (Ex. 1); July 29, 2026 email from DoorDash's counsel (Ex. 2); and DoorDash's proposed redline of the enablement instruction attached to July 29, 2026 email (Ex. 3) |
| "Rowan Dep." | The December 12, 2025 deposition of Jon Rowan, lodged with the Court by DoorDash on July 22, 2026. Excerpts are attached to this motion as Exhibit 4 |
| "DX-208" | Trial Exhibit DX-208 (*see* Joint Final List of Admitted Exhibits, Dkt. 88). Attached to this motion as Exhibit 5 |
| "DX-209" | Trial Exhibit DX-209 (*see* Joint Final List of Admitted Exhibits, Dkt. 88). Excerpts are attached to this motion as Exhibit 6 |
| "PX-239" | Trial Exhibit PX-239 (*see* Joint Final List of Admitted Exhibits, Dkt. 88). Excerpts are attached to this motion as Exhibit 7 |

[redacted]

# I. INTRODUCTION

*So there's a very old expression. You will know me by my deeds.*
—DoorDash's Closing Argument

DoorDash began trial in this case with a condemnation: Fall Line "hid[] evidence from their own experts." And DoorDash ended it with a sermon: "Is this how you plead a righteous case?" DoorDash told the jury to use deeds as the measure. And the deeds it named were Fall Line's: the "hidden data" that DoorDash said it had "shown you guys . . . a few times during this litigation for a reason" and that "they didn't want [their expert] to see." DoorDash was right about one thing: that expression is "very old" indeed.[1] But let us consider the deeds of the preacher as well. Here, DoorDash's deeds led to two prejudicial errors that warrant a new trial.

The first error was the improper admission of DX-209, tables that DoorDash scissored out of its own interrogatory answers. On the first day of trial, the Court asked DoorDash's counsel a single question about DX-209: "Any doubt this is coming in on a business records exception?" DoorDash secured the admission of DX-209 by representing that it "was produced by employees at DoorDash at the direction of DoorDash as a normal course of business." One might have expected at trial, then, a custodian, a recordkeeping system—or at least some account of the record's regular business use. What arrived instead was testimony that "[t]his table was prepared by DoorDash in response to a request in the interrogatory": made, that is, for this case.

DoorDash did not just fail to prove the business-records exception for DX-209; its own statements disproved it. The exception rests on a simple idea: contemporaneous records kept routinely for business reasons tend to be reliable. But as the Fifth Circuit recently explained in

[1] DoorDash's expression evokes the Sermon on the Mount. The test it describes echoes this verse—"Ye shall know them by their fruits." Matthew 7:16 (King James Version). The preceding verse states the test's purpose: "Beware of false prophets, which come to you in sheep's clothing, but inwardly they are ravening wolves." Matthew 7:15. *See infra* § III.B.2.b.

[redacted]

*Hager*, “documents prepared specifically for use in litigation” are the opposite—they are “***dripping with motivations to misrepresent***.” And the activity that produced DX-209 was not delivering food but responding to Fall Line’s interrogatories—DX-209’s sponsoring witness said so. That followed an earlier confession from counsel, at the pretrial conference, that “we scoured the earth to find this additional information,” which “wasn’t something that we knew we could pull.” That is the polar opposite of a record made as a regular practice of DoorDash’s delivery business. And DoorDash chose a heading for the exhibit’s key table that announced the very conclusion that DoorDash asked the jury to reach: that in 90% of transactions, Location Services is not used—so DoorDash doesn’t infringe. But when asked whether the heading was true, the exhibit’s sponsor said she was “not in a position to tell that.”

Once DX-209 was admitted, DoorDash built a theme around it. From opening through closing, DoorDash told the jury that Fall Line hid the exhibit’s data from its own experts. But the blacked-out columns were unrequested and untimely data that DoorDash wedged into a court-ordered production, which Fall Line had moved *in limine* to exclude. Fall Line asked to tell the jury exactly that, raising it at sidebar as the agreed MIL order required, and was told: “I’m not going to let you get into that.” So the heading DoorDash chose for DX-209 during this case was used to turn Fall Line’s redactions of data that it was not using, and did not want to sponsor, into “hidden data.” DoorDash hammered this theme “for a reason”: to attack Fall Line’s credibility—“You will know me by my deeds”—not just Fall Line’s damages model.

The second prejudicial error was allowing DoorDash’s use of deposition testimony from Jon Rowan—Fall Line’s 30(b)(6) witness—that was taken on short notice. Because Rule 32(a)(5)(A) “provides no room for discretion,” the Court held before trial that the rule “bars the DoorDash Defendants from using Mr. Rowan’s 30(b)(1) deposition testimony.” But his

[redacted]

testimony used at trial was his personal opinion, not Fall Line's. The original question began, "***And from your use of the DoorDash app,*** is it fair to say that the DoorDash app can be used anywhere and is not customized for any particular location?" The eventual answer: "Yes, I think that would be fair to say." But no topic called for Fall Line's opinions about claim language divorced from the Court's constructions—and this question did not reference the patent at all. And the answer was given after DoorDash agreed to "read [Mr. Rowan] the question one more time." So the omission of the "from your use" phrase from the restated question did not change its personal nature. All day, when Mr. Rowan actually spoke for Fall Line, he pointed to Fall Line's experts and counsel for its views on what the claim language means and how it applies.

Worse, that was the same opinion (in fewer words) that DoorDash's technical expert put in his report—and that the Court struck for making improper comparisons with the mystery shopper embodiment rather than applying the Court's construction. So the non-infringement opinion that DoorDash's technical expert was barred from giving instead came in through lay witness testimony. DoorDash then billed the exchange to the jury as "binding on Fall Line," and celebrated it in closing as "Mr. Jon Rowan admitting non-infringement on the customize term."

In its closing, DoorDash pressed the attack past the tainted evidence itself. DoorDash argued that Fall Line "just slept on their rights"—an hour after the Court instructed this jury that pre-suit notice "is not relevant to infringement or to the amount of damages," and despite the parties' agreed bar on arguing equitable defenses. Fall Line does not present these arguments as independent grounds for a new trial. But they served the same end as the tainted evidence: convincing the jury to distrust Fall Line. So they heighten the prejudice of both errors and confirm that no one can be sure that the general verdict was not influenced by inadmissible evidence, as required under Fifth Circuit law to deny a new trial.

[redacted]

So what were DoorDash's deeds at trial? An asserted business-records foundation that was disproved by DoorDash's own witnesses. A concealment accusation pressed for four days while Fall Line's explanation was excluded. Barred testimony, admitted over objection, that replicates stricken opinions. And a closing that made arguments contrary to the jury instructions and the parties' agreements. Rule 59 provides a remedy: the Court should grant a new trial.

Independent of the new trial motion, the Court should grant Fall Line's renewed motion for judgment as a matter of law on enablement. Although DoorDash asserted an enablement defense, it never really tried to prove it. At summary judgment, the Court said that "Defendants' technical expert, Dr. Black, did not offer any opinion on enablement in his expert report," and that "Defendants have not addressed any of the *Wands* factors." Trial was no different. DoorDash conceded at closing that "Dr. Black did not speak about" enablement. And DoorDash relied on the same two items of evidence that had failed to carry its burden before. Entering judgment as a matter of law on enablement may be a narrow request, but it is not a close one.

## II. BACKGROUND

Fall Line owns U.S. Patent No. 9,454,748; DoorDash is accused of practicing claim 7 of the 748 patent through its DoorDash mobile app. This Background sets out the record on which the new-trial grounds and the renewed enablement motion rest.

### A. Fall Line Moves To Compel Location Sharing And Precise Location Data

As explained by Fall Line's damages expert, Justin Blok, Fall Line's damages model accused orders placed with Location Services enabled and Precise Location on. Vol. 3 604:3–10; 608:4–10. So Fall Line wanted DoorDash's numbers for both settings. After Fall Line's first motion to compel, DoorDash produced figures for the first setting alone, broken out by "the associated permissions to use location services" and reaching back only to December 2023:

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3 (JAN. 23, 2026):**

Subject to the foregoing general and specific objections, DoorDash responds as follows: The following table identifies the monthly number of orders in the United States per mobile device operating system and estimates of the associated permissions to use location services:

| Month | Platform | Permission to Use Location Services | Number of Orders |
|---|---|---|---|
| Dec. 2023 | Android | Granted | [redacted] |
| | | Not Granted | |
| | iOS | Granted: Always | |
| | | Granted: When App is in use | |
| | | Not Granted | |
| Jan. 2024 | Android | Granted | |
| | | Not Granted | |
| | iOS | Granted: Always | |
| | | Granted: When App is in use | |
| | | Not Granted | |
| Feb. 2024 | Android | Granted | |

PX-239 at 18 (excerpted; highlighting added).

Two things were missing even then. The table began in December 2023—thirteen months of a damages period that ran from late 2018 to the patent's expiration in December 2024. Vol. 3 604:3–4; 604:20–21. And it said nothing about how often Precise Location, which ships enabled, was left on. Vol. 2 346:11–13. But Fall Line wanted DoorDash's own numbers.

So Fall Line moved to compel both—more months of the permission data, and the precise-location data DoorDash had never produced—on December 10, 2025, and again on renewal. Five months after the first motion, the Court ordered DoorDash to produce its transaction and privacy-settings data, including the precise-location figures, and to put up a Rule 30(b)(6) witness on the subject. Lead Dkt. 444-1 at 6–9.

### B. One New Column Is Ordered, Yet Four More Arrive With It

It took DoorDash nearly a month to comply. The production, served June 8, 2026, answered the second question while leaving the first exactly where it stood. Not one month was added to the table of location-sharing permissions, but a single column of precise-location

figures finally arrived. DX-208 at 20–22. Those figures begin in December 2023—the same month the permission data begins—and they confirmed what Fall Line's expert had said all along: "Precise Location was enabled 99 to a hundred percent of the time when Location Services were enabled." Vol. 3 607:10–14; 7/16/26 Hr'g Tr. 67:5–14 ("That was the answer they didn't want us to have.").

But the ordered column did not arrive alone. Around it DoorDash inserted four columns nobody had asked for—including the two "Does Not Use Location Services" columns that its case would turn on—sorting three and a half years of transactions into categories of DoorDash's own devising. Fall Line had moved for, and the Court had ordered, "transaction and privacy setting data"—"[h]ow often . . . users of [the DoorDash Defendants'] mobile applications choose each of the location privacy options available to them." Lead Dkt. 444-1 at 8–9. The added columns instead show "how DoorDash customers typically provide their delivery addresses," Vol. 3 697:13–21, without any correlation to selected location privacy options:

| Month | Does Not Use Location Services | Uses Location Services | iOS Precise Location |
|---|---|---|---|
| | [redacted] | | |
| 2021-06-01 | | | |
| 2021-07-01 | | | |
| 2021-08-01 | | | |
| 2021-09-01 | | | |
| | | | |
| 2023-10-01 | | | |
| 2023-11-01 | | | |
| 2023-12-01 | | | |
| 2024-01-01 | | | |

DX-208 at 21; DX-209 at 8 (red box added; intervening rows omitted).

The new columns also reach back years before the ordered precise-location data begins, into months when, by Ms. Merrigan's account, DoorDash was still "ramping up" its collection.

[redacted]

Vol. 3 606:6–12, 665:1–3. DoorDash never explained how it could produce years more of the data that no one requested than it could of the data that the Court actually ordered. The closest explanation: "we scoured the earth to find this additional information," which "wasn't something that we knew we could pull." 7/16/26 Hr'g Tr. 70:22–23, 69:11–12.

The banner headings at the top—including "Does Not Use Location Services"—are labels that DoorDash chose for the data columns below. Vol. 3 710:8–15; *infra* § III.B.1.c. The "iOS Precise Location On" column—the only column reflecting data Fall Line requested—reads "--" until December 2023, and a footnote states that DoorDash "does not maintain such information" for Android. DX-208 at 21 n.1; DX-209 at 8 n.1

Fall Line took the insertion to the Court. It moved *in limine* to preclude the injected data (its MIL #4). Lead Dkt. 471 at 4–5. DoorDash answered that the "disclosure was made directly in response to Fall Line's December 10, 2025 motion to compel," and the Court, accepting that representation, denied the motion. Dkt. 60 at 5 (quoting Lead Dkt. 484 at 4). So Fall Line used the data it had fought for, declined to sponsor admission of the unrequested data that DoorDash had inserted, and prepared a redacted copy of the responses (PX-239) for its exhibit list.

### C. Two Weeks Before Trial, DoorDash Puts Its Tables Into A Fresh Exhibit

The first trial exhibit that DoorDash created as a vehicle for the four disputed columns was DX-208, which was the same as Fall Line's PX-239 without redacting those columns. But DoorDash's interrogatory responses, when offered by DoorDash itself, are obviously hearsay—inadmissible unless an exception could be proven. And DX-208 looked like what it was: a case-captioned, counsel-signed interrogatory response.

So, two weeks before trial, DoorDash created a new exhibit. "[W]e will provide a new version of DTX 208 (DD ROG Responses) that only includes the data DoorDash provided in response to ROGs 3 and 4 to make it clear that we are not asking to admit the other information

[redacted]

in the ROGs." Ex. 1 [July 13 email]. The tables were "cut out of this document and copied over to DX-209 by DoorDash," its witness later agreed. Vol. 3 699:6–8. Shorn of the case caption, the objections, and the signature block that identified the document as litigation work product, the tables were turned into a freestanding trial exhibit. *Compare* DX-208 *with* DX-209.

Fall Line objected to DX-209 as hearsay on the first day of trial. "Defendant's saying they're going to be able to get it in through a business records exception, but that hasn't been proven up." Vol. 1 169:9–14. DoorDash's counsel represented that the exhibit "was produced by employees at DoorDash at the direction of DoorDash as a normal course of business," and the objection was overruled. Vol. 1 169:21–170:5.

The foundation for the business-records exception never came. DoorDash's first Rule 30(b)(6) designee, Dan Hefter, could not say who prepared the predecessor table or from what inputs. Vol. 2 520:13–18. Ms. Merrigan's Rule 30(b)(6) deposition explained that it involved a data-engineering team "going into the archives." Vol. 3 661:7–665:22. Live, she completed the story: the table was "prepared by DoorDash in response to a request in the interrogatory." Vol. 3 712:14–15. And as for DX-209's central premise—that a saved-address order does not use Location Services—Ms. Merrigan said "I'm not in a position to tell that." Vol. 3 713:5–8.

None of that slowed down DoorDash's use of DX-209. DoorDash displayed the tables in its opening, Vol. 1 236:21–237:10, and built on them a concealment theme that ran through all four trial days and into its damages case and closing. Vol. 1 237:16–18; Vol. 2 488:4, 489:15, 491:6; Vol. 3 637:3–5; Vol. 4 897:6–7, 1022:10–21; *infra* § III.B.2.b. By the time Fall Line could address the label directly in its closing, it had been in front of the jury for four days. Vol. 4 1017:21–1018:8. And the explanation for the redactions—the compelled-production history told above—never reached the jury at all. It was a "discovery dispute" that Fall Line was precluded

[redacted]

from discussing. Vol. 3 707:15–19.

### D. DoorDash Argues Concealment, And Fall Line's Answer Is Excluded

What the jury heard instead began on the first day: DoorDash told the jury that Fall Line was "hiding evidence from their own experts." Vol. 1 239:21–22. Day after day, witnesses were shown the redacted exhibit and asked about "hidden" data. Vol. 2 488:4, 489:15, 491:6; Vol. 3 637:23–638:4. And the theme survived despite Fall Line's experts saying that the redacted data changed nothing. Vol. 2 487:4–6; Vol. 3 639:17–19. It survived in part because it could not be explained. When Fall Line sought to tell the jury why the redactions were made, the agreed MIL on discovery disputes blocked it: "I'm not going to let you get into that." Vol. 3 707:15–19.

By closing, the theme and its purpose were explicit. Counsel handed the jury a test—"You will know me by my deeds. . . . Is this how you plead a righteous case?"—and named the first deed: "We've shown you guys this redacted data a few times during this litigation for a reason, hidden data. . . . [I]t's not disputed that they hid this data from their own expert." Vol. 4 1021:12–14; 1022:10–21. The deeds that DoorDash invited the jury to judge were Fall Line's redactions. The explanation for them was the one thing the jury was never permitted to hear. Four days of accusation; zero minutes of answer.

### E. The Court Bars Using Mr. Rowan's Personal Testimony

Jon Rowan is an attorney. His only connection to Fall Line is that it paid him $10,000 to serve as its corporate designee under Rule 30(b)(6) on November 18, 2025, a role he had served in before. Rowan Dep. 14:24–15:6; Vol. 3 738:20–739:5. DoorDash then noticed a personal Rule 30(b)(1) deposition on less than fourteen days' notice—first notice December 3, subpoena December 10, Lead Dkt. 306-6—and the deposition went forward on December 12 with Fall Line's protective order motion still pending. Lead Dkt. 384 at 4–5.

Fall Line's counsel opened the deposition by objecting to the insufficient notice and

[redacted]

asking the examiner "to clarify whether you're trying to take 30(b)(6) testimony or 30(b)(1) testimony." Rowan Dep. 8:25–9:16. No blanket answer ever came.

The Court resolved the motion before trial: Rule 32(a)(5)(A)'s language "provides no room for discretion," and the order was categorical—"Rule 32(a)(5)(A) bars the DoorDash Defendants from using Mr. Rowan's 30(b)(1) deposition testimony." Lead Dkt. 384 at 2, 4. On Day 2 of trial, the Court restated the framework in one sentence: "we allowed the 30(b)(6) testimony but not the 30(b)(1) testimony." Vol. 2 499:2–4.

**F. DoorDash Builds Its "Customized" Case On Mr. Rowan's Personal Opinions**

Mr. Rowan's barred personal testimony reached the jury three times. The first was on Day 2, when DoorDash cross-examined Fall Line's technical expert with it over Fall Line's sidebar objection—"This was excluded. This was 30(b)(1) testimony." Vol. 2 497:23–498:1. The Court allowed the examination; DoorDash's counsel confirmed his own characterization to the witness ("binding on Fall Line, correct?"); and the jury heard the exchange—the app "can be used anywhere and is not customized for any particular location"—with the question's opening clause ("And from your use of the DoorDash app") omitted from the version read. Vol. 2 500:2–501:1. On redirect, Fall Line read the full initial question back, and Dr. Russ confirmed that DoorDash was asking about Mr. Rowan's "use of the DoorDash app, not about his corporate testimony." Vol. 2 512:4–10; *infra* § III.C.1.b.

The second use came on Day 3, when DoorDash played one minute and four seconds of the deposition video over Fall Line's renewed objections; the Court excluded only the portion comparing the DoorDash app to the McDonald's app. Vol. 3 720:13–723:22 (excluding Rowan Dep. 95:14–96:13); Vol. 3 738:11–739:10. And the third use was later that same day, when DoorDash had Dr. Black repeat the exchange in his direct examination. Vol. 3 759:1–8.

By closing, the exchange had become the anchor of DoorDash's "customized" case,

[redacted]

quoted to the jury as "Mr. Jon Rowan admitting non-infringement on the customize term." Vol. 4 1034:15–16; *infra* § III.C.2.

**G. DoorDash Asserts Lack Of Enablement But Calls No Witness To Prove It**

DoorDash carried an enablement defense to verdict. The joint final pretrial order lists it among DoorDash's affirmative defenses and lists the issue as contested. Lead Dkt. 473 at 5, 7; *see also* Lead Dkt. 297 at 11 (Second Affirmative Defense). Its technical expert never addressed it. As this Court found: "Defendants' technical expert, Dr. Black, did not offer any opinion on enablement in his expert report on invalidity." Lead Dkt. 507 at 48.

DoorDash moved for summary judgment on enablement anyway, relying on two items of evidence. DoorDash cited a sentence from Dr. Russ's rebuttal report saying a technical feature was not "known" at the priority date. But "the fact that 'Dr. Russ said something was not well-known, routine, and conventional in no way means that a person of skill in the art would not have been able to make and use it without undue experimentation.'" Lead Dkt. 507 at 48 (quoting Lead Dkt. 396 at 18). DoorDash also cited snippets from the patent itself. But "attorney argument" is "insufficient for Defendants to meet their burden on summary judgment given that patents are 'presumed valid.'" *Id.* at 49. The Court stressed that "Defendants have not addressed any of the *Wands* factors" and failed to "meet their burden." *Id.* at 48; *infra* § IV.B.

The trial delivered nothing new for the enablement defense. Dr. Black took the stand and was not asked a single question about enablement. DoorDash's own closing conceded as much: "Enablement. So there is—there is an invalidity issue in this case. And Dr. Black did not speak about it. We hired him for this trial to discuss non-infringement…." Vol. 4 1040:21–24.

What DoorDash tried instead was to build the defense out of Fall Line's expert on cross-examination. That attempt yielded no new opinions and Dr. Russ's answer that counsel was "asking me to create new opinions here in court." Vol. 2 491:13–494:8. In closing, DoorDash

[redacted]

told the jury the opposite of what Dr. Russ had said and of what this Court had already held: "So he said: The person of skill would not know how to do this." Vol. 4 1041:4–5; *infra* § IV.B.

### H. The Jury Renders Its Verdict

After closing argument, the jury retired and returned with a "no" answer to Question 1 on infringement; per the verdict form's instructions, it did not reach invalidity or damages. Dkt. 79. It had been out eighty-five minutes. Dkt. 85 at 3; Vol. 4 1055:16–18.

## III. FALL LINE'S MOTION FOR A NEW TRIAL UNDER RULE 59

Two grounds independently warrant a new trial. First, DX-209 was admitted on a business-records exception that DoorDash's own statements disproved, then used to attack Fall Line's credibility through a "hidden data" theme that Fall Line was not permitted to explain. Second, DoorDash was allowed to use lay testimony from Jon Rowan that was barred by the Court's order, and that mimicked expert opinions that the Court had previously struck, as an admission of non-infringement by Fall Line. Because this was a general verdict, either ground alone is sufficient for a new trial. DoorDash's closing heightened the prejudice of both.

### A. Rule 59 Asks Whether The Trial Was Fair, And This General Verdict Leaves No Way To Say It Was

Rule 59 does not ask whether this verdict was possible; it asks whether the trial that produced it was fair. The rule permits a new jury trial "on all or some of the issues" "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). And this Court grants one where "it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Maxell, Ltd. v. Samsung Elecs. Co.*, 805 F. Supp. 3d 749, 760–61 (E.D. Tex. 2025). For evidentiary error the measure is the whole trial, not the disputed exhibit: a new trial is required unless the Court "is sure, after reviewing the *entire* record, that the error did not influence the jury or had but a

[redacted]

very slight effect on its verdict." *Cruz v. Cervantez*, 96 F.4th 806, 814 (5th Cir. 2024) (quoting *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 361 (5th Cir. 1995)) (italics in original). The inquiry here must account for the opaque nature of a general verdict. "[W]hen a case is submitted to the jury on a general verdict, the failure of evidence or a legal mistake under one theory of the case generally requires reversal for a new trial because the reviewing court cannot determine whether the jury based its verdict on a sound or unsound theory." *Muth v. Ford Motor Co.*, 461 F.3d 557, 564 (5th Cir. 2006). Such a verdict stands only if the court is "totally satisfied" or "reasonably certain" that it did not rest on the tainted ground. *Id.* at 564–65 (quoting *Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir. 1984)).

### B. The Improper Admission Of DX-209 Warrants A New Trial

Fall Line is entitled to a new trial based on DX-209, the tables cut from DoorDash's own interrogatory responses and admitted on counsel's representation that it was a business record made in the normal course. *Supra* §§ II.B–II.D. As explained below, DX-209 was wrongly admitted under the business-records exception; that error prejudiced Fall Line's substantial rights, measured against the entire record; and Fall Line timely objected. Fed. R. Evid. 103(a); *Magēmā Tech. LLC v. Phillips 66 Co.*, 153 F.4th 1248, 1258–59 (Fed. Cir. 2025) ("Because we cannot be sure the error did not influence the jury, we believe that 'manifest injustice [would] result from letting the verdict stand.'").

#### *1. DX-209 was improperly admitted under the business-records exception*

DX-209 was hearsay. DoorDash never proved a business-records exception for it, and the trial record affirmatively forecloses one.

##### *a. DX-209 was hearsay, so DoorDash had to prove an exception*

DX-209 is DoorDash's own out-of-court statement: tables cut from counsel-signed interrogatory answers, offered by DoorDash itself for the truth of what they assert. *See*

[redacted]

*Bernhardt v. Richardson-Merrell, Inc.*, 892 F.2d 440, 443 n.3 (5th Cir. 1990) ("We decline to consider [plaintiff's] interrogatory answers as furnishing evidentiary support for the [plaintiff's] summary judgment response" because they are "hearsay."). Rule 801(d)(2) removes a party's statement from the hearsay rule only when it is "offered against an opposing party," a condition DoorDash cannot satisfy for its own responses. So DX-209 was hearsay unless an exception was proven. Fed. R. Evid. 802. Proving one was DoorDash's burden.

And the business records exception was the only one that DoorDash invoked. Under the joint final pretrial order, the jury could be shown DX-209 in opening only if any objections to it were overruled. Lead Dkt. 473 at 12. So Fall Line objected to DX-209 as hearsay on the first day of trial, adding that DoorDash was "saying they're going to be able to get it in through a business records exception, but that hasn't been proven up." Vol. 1 169:9–14. The Court asked a single question: "Any doubt this is coming in on a business records exception?" Vol. 1 169:19–20. DoorDash's counsel answered with a preview: Ms. Merrigan "is going to be the sponsoring witness for it," and the exhibit "was produced by employees at DoorDash at the direction of DoorDash as a normal course of business." Vol. 1 169:21–170:2. The Court did not wait for him to finish before overruling Fall Line. Vol. 1 170:3–5. That was DoorDash's entire showing for the exception before DX-209 was admitted: a few lines of argument, delivered before a witness had been sworn, about a document no one had yet described under oath at trial.

*b. Even though Fall Line's objection was overruled, that did not prove the exception*

The Court's ruling gave DoorDash the right to use the exhibit. It did not give DoorDash a foundation for the business-records exception. Once Fall Line objected to DX-209's admission, "[i]t then became [DoorDash's] burden to show, by a preponderance of the evidence, that the evidence fell within an exclusion or exception to the hearsay rule and was therefore

[redacted]

admissible." *Sowders v. TIC United Corp.*, No. SA-05-CA-309-OG, 2007 WL 3171797, at *1 (W.D. Tex. Aug. 15, 2007) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)). And this showing must be made with evidence. As the Fifth Circuit agreed in a case that began much like this one, "counsel's assertions do not constitute evidence and thus cannot lay the foundation for Rule 803(6)." *U.S. Commodity Futures Trading Comm'n v. Dizona*, 594 F.3d 408, 415 (5th Cir. 2010).

What matters is whether the proponent introduces sufficient evidence to prove the exception. The proponent in *Dizona* had won its ruling too: the hearsay objection was overruled and the exhibit went to the jury. *Id.* at 415, 417. But the exhibit's admission was an abuse of discretion all the same, because after the objection the proponent "offered no evidence to establish that the requirements of Rule 803(6) had been met," including "no showing that it was [the company's] regular practice to make [the exhibit]." *Id.* at 415 & n.4, 417.

So DoorDash knew what it still needed. Both sides had identified the same missing item—the exception "hasn't been proven up," Vol. 1 169:12–14—and DoorDash answered by naming the witness who would prove it up. Vol. 1 169:21–23. No witness ever did.

*c. DoorDash did not show that DX-209 met the business-records exception*

The business-records showing is not onerous for a genuine "Record[] of a Regularly Conducted Activity." Fed. R. Evid. 803(6). Rule 803(6)'s conditions "are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12)." Fed. R. Evid. 803(6)(D). A custodian or qualified witness testifies that (A) the record was made at or near the time by someone with knowledge, (B) it was kept in the course of a regularly conducted business activity, and (C) it was made as a regular practice of that business activity. Fed. R. Evid. 803(6)(A)–(C). But the foundation must be laid for the

[redacted]

specific record—e.g., when this table was made, by whom, in what way, and for what purpose.

Yet DoorDash did not ask Ms. Merrigan, the "sponsoring witness" for DX-209, any of the necessary questions. She introduced DX-209 to the jury as "data that DoorDash provided to Fall Line," and agreed that she reviewed it as "part of [her] preparation to testify in this case." Vol. 3 690:21–25. The closest she came to being asked a foundation question for the exception was about DoorDash maintaining the type of information included in DX-209. Asked whether it "is . . . the practice of DoorDash to maintain this kind of information ***in the regular course of its business***," Ms. Merrigan answered that "[y]es, we maintain this information ***in our internal systems***." Vol. 3 691:1–4 (emphasis added). But even if Ms. Merrigan had said that DX-209 itself was "maintained in the regular course of business," that still would not have been enough. *See, e.g., Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 703 (5th Cir. 2024), 102 F.4th 692, 703 (5th Cir. 2024) (disregarding as "conclusory" an assertion of regular-course preparation made "with no further explanation about whether it was company procedure to make similar records" outside of litigation). That answer is a statement about DoorDash's data. It is not an explanation of how DX-209 came to be made, or evidence that making it was anything DoorDash regularly did. *See id.* (requiring evidence that "it was the ***regular practice*** of that business activity to make the ***particular*** writing, statement, report or record part of its business records.") (emphasis added).

Nor did any other DoorDash testimony fill the gap. Mr. Hefter, DoorDash's first 30(b)(6) witness to discuss its data, could not say who prepared the initial version of one of DX-209's tables ("I don't know if I have everybody that was involved") or from what inputs ("I'm not sure"). Vol. 2 520:13–18; 534:8–15. And Ms. Merrigan was neither a custodian nor a qualified witness. She was a tax executive who prepared for "a number of hours" with counsel and data engineers. 7/16/26 Hr'g Tr. 71:24–72:5.

[redacted]

Ms. Merrigan did not have to be DX-209's author, and she did not have to "personally attest to its accuracy." *United States v. Brown*, 553 F.3d 768, 792 (5th Cir. 2008). But she did have to be able to "explain the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met." *Id.* *Brown* held a witness unqualified on exactly this line: he "knew about the pharmacy computer system, how to operate the system, and how to extract information from it, but that is not knowledge about the pharmacy's record keeping," and "[a]midst all of his unquestioned expertise," he "lacked this necessary familiarity" with the "record keeping procedures of the organization." *Id.* at 792–93. No witness—Ms. Merrigan included—explained DoorDash's record keeping for DX-209 or vouched that the rule's requirements were met.

In fact, Ms. Merrigan could not have supplied the foundation even if DoorDash had asked. The central feature of DX-209 in dispute is the heading "Does Not Use Location Services" that the table places above the "Manual Entry" and "Use Saved Address" categories of data below. *Supra* § II.B; DX-209 at 8. Ms. Merrigan's one arguably foundational answer—"we maintain this information in our internal systems," Vol. 3 691:1–4—was about data. She also agreed that DoorDash "chose to put this column Use Saved Address under the heading Does Not Use Location Services." Vol. 3 710:8–15. The latter answer is about a choice—one made to give DX-209 the meaning that DoorDash argued to the jury. No witness said where that heading came from, when it was placed above the saved-address column, or who put it there.

And asked whether that choice was correct—whether "just because a saved address is used, that means Location Services is not used"—Ms. Merrigan could not say: "I'm not in a position to tell that." Vol. 3 713:5–8. She was not asked to verify an entry DoorDash's systems had captured; she was asked what DoorDash's own arrangement of the data meant—but she

[redacted]

could not say. "Under those circumstances," Ms. Merrigan "was not a qualified witness who could explain [DoorDash's] record keeping system and vouch that the requirements of the rule had been met" for DX-209. *See Dizona*, 594 F.3d at 416.

*d. Worse, DoorDash's admissions refuted the business-records exception*

What the record does contain is worse for DoorDash than silence: it affirmatively precludes finding that DX-209 met Rule 803(6)(A), (B), or (C). Conditions (A) and (C) plainly fail on the facts stated above. For Rule 803(6)(A), a table served in June 2026 describing events many years older is not "made at or near the time" of the events recorded. For Rule 803(6)(C), the tables were built during this case by a data-engineering team excavating DoorDash's archives for data that "live in . . . two different database platforms," through work counsel described as "scour[ing] the earth" for data DoorDash did not know it could pull. *Supra* §§ II.B–II.C; Vol. 2 533:22–534:7; Vol. 3 661:7–665:22; 7/16/26 Hr'g Tr. 70:22–23, 69:11–12. That is the antithesis of a record made as "a regular practice" of DoorDash's ordinary business.

And the condition that buries the exception outright is Rule 803(6)(B): the record must be "kept in the course of a regularly conducted activity of [the] business." DX-209 was created for one purpose, and it was not a business one. A genuine record of this data would exist to support DoorDash's ordinary business—made because the business needs to know whether its transactions use location services. DX-209 exists because Fall Line served an interrogatory. Ms. Merrigan said so on cross-examination: "[t]his table was prepared by DoorDash in response to a request in the interrogatory." Vol. 3 712:14–15.

That concession is disqualifying. "Summaries of records prepared for litigation are not admissible under the business records exception to the hearsay rule, because litigation is not a 'regularly conducted business activity.'" *Hager*, 102 F.4th at 703 (quoting 8 Cyclopedia of Fed.

[redacted]

Proc. (3d ed.) § 26:372). The Supreme Court drew that line in *Palmer v. Hoffman*, excluding an accident report kept "in the regular course" by a railroad because it was "calculated for use essentially in the court, not in the business." 318 U.S. 109, 113–14 (1943); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321–22 (2009) ("Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. . . . But that is not the case if the regularly conducted business activity is the production of evidence for use at trial.").

And the reason is trustworthiness: "documents prepared specifically for use in litigation are '***dripping with motivations to misrepresent***.'" *Hager*, 102 F.4th at 703 (emphasis added) (quoting *Hoffman v. Palmer*, 129 F.2d 976 (2d Cir. 1942), *aff'd*, 318 U.S. 109 (1943)) (cleaned up); *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988) (holding exception was unmet where forms' "primary utility . . . is for litigation"). Because DoorDash conceded that DX-209 was prepared for use in this case, the exception was never available for it.

In sum, the trial record forecloses a finding that DX-209 meets any of the requirements of the business-records exception. DoorDash offered a representation in place of a foundation, and the trial disproved the representation. DX-209 is not a record of DoorDash's regularly conducted business; it is a record of DoorDash's litigation defense.

***2. DoorDash used DX-209 to urge the jury to disbelieve Fall Line entirely, so its admission was prejudicial***

DX-209's admission was prejudicial. It did not merely put a document in front of the jury. It told the jury that the document was evidence—that what it said could be taken as true. DoorDash spent four days turning that document into a reason to disbelieve Fall Line.

*a. An error is prejudicial unless the Court can be sure that it did not influence the verdict, including how the jury evaluated the evidence of infringement*

The prejudice inquiry asks whether the Court can be "sure, after reviewing the *entire* record, that the error did not influence the jury or had but a very slight effect on its verdict."

[redacted]

*Cruz*, 96 F.4th at 814 (italics in original). The question is influence, not sufficiency. The test is whether erroneously admitting an exhibit "affected the substantial rights" of the objecting party, not whether some other evidence might have supported the same verdict. Fed. R. Civ. P. 61; Fed. R. Evid. 103(a). "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *VirnetX Inc. v. Apple Inc.*, No. 6:12-CV-855, 2016 WL 4063802, at *5 (E.D. Tex. July 29, 2016) (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 525 F.2d 927, 930 (5th Cir. 1976)).

None of this requires showing that DX-209 could have carried the non-infringement verdict alone. Improper matter that "in reasonable probability, affected both the liability and damages issues" warrants a new trial on both, even where liability was "hard fought and closely contested." *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 282–83 (5th Cir. 1975) ("[C]ounsel's final argument to the jury was clearly prejudicial . . . . [T]he issues of liability and damages were both improperly influenced."). This Court applied a similar rule in *VirnetX*, where prior-verdict references "potentially spilled over into the jury's finding of infringement of iMessage"—a product that "was not part of" the prior verdict—and where there was "no way to untangle liability from damages." *VirnetX*, 2016 WL 4063802, at *7. And so did the court in *Cirba*, where a trial theme based on an improper participant—something that could not have carried the infringement verdict—required a new trial. *Cirba Inc. v. VMware, Inc.*, No. 19-742-LPS, 2020 WL 7489765, at *5-6 (D. Del. Dec. 21, 2020) ("[I]t is the accumulation of events . . . that persuade the Court a new trial is warranted.").

A key way that tainted material may prejudice a liability verdict is by influencing credibility issues. "Credibility determinations are sensitive matters," and tainted evidence that

[redacted]

affects credibility can create an "unfair advantage." *Latiolais v. Whitley*, 93 F.3d 205, 209 (5th Cir. 1996) (vacating verdict and remanding for new trial). Where a verdict "hinged on competing credibility determinations," the harm from improperly admitted evidence is "especially acute"—those are the cases in which no court can be "sure." *Swearingen v. Gillar Home Health Care, L.P.*, 759 F. App'x 322, 325–26 (5th Cir. 2019) (reversing and remanding for a new trial based on erroneous admission of deposition testimony because of the potential effect on credibility). Evidence that attacks credibility can influence every question the jury answers. Indeed, it may create an "atmosphere of disbelief" that can "permeate[] the entire trial" and taint findings far from the evidence's nominal subject. *Davidson Oil Country Supply Co. v. Klockner, Inc.*, 917 F.2d 185, 186 (5th Cir. 1990) (per curiam) (ordering retrial of all issues where evidentiary error "contributed to the discrediting of [plaintiff's] witnesses").

Finally, prejudice is measured against the case that DoorDash actually tried. DoorDash offered DX-209 on one theory, the business-records exception, and the Court overruled Fall Line's objection on that ground alone. Vol. 1 169:19–170:5. Grounds that a proponent never invoked—and foundations it never attempted to lay—cannot render the error harmless now.

*b. Because DoorDash repeatedly used DX-209 to attack Fall Line's credibility—using a heading no witness could vouch for—its admission prejudiced Fall Line*

It is true that DoorDash used DX-209 as damages evidence: its damages expert took "another 90 percent" off the royalty base on the strength of the exhibit's heading. Vol. 4 897:1–9. But DoorDash's use of DX-209 did not stop with damages.

What DoorDash built on DX-209 was a reason to disbelieve Fall Line about everything, and it began building it from the start. In opening, the jury was shown the tables and then the same data redacted: "on the bottom, this blacked out data, this is what Fall Line gave their expert, Dr. Russ. So Fall Line blacked out the evidence…." Vol. 1 236:21–237:10; Dkt. 91-2

[redacted]

[DD Opening] at 49, 51 (comparing DX-209 to PX-239). Counsel stated the point of the display in the next breath: hiding evidence from your own expert is not "reasonable." Vol. 1 237:16–18. Between opening and closing the theme was driven home with both of Fall Line's experts. Its infringement expert was walked through the redactions, asked whether Fall Line "hid data from you," and answered that the unredacted version "did not change my opinion." Vol. 2 484:9–491:12; 487:5–6. Its damages expert was told, as fact, that "the data actually shows that approximately 90 percent of transactions do not use Location Services." Vol. 3 637:3–5.

Then came the closing, where DoorDash explained the exhibit's purpose in its own words. Counsel offered the jury a test: "You will know me by my deeds. Think about it. Is this how you plead a righteous case?" Vol. 4 1021:12–14. He said he would "go into a couple of them"—a couple of the deeds—and the first one was this exhibit: "We've shown you guys this redacted data a few times during this litigation for a reason, hidden data. . . . [I]t's not disputed that they hid this data from their own expert." Vol. 4 1022:11–17. DoorDash made sure the jury knew why it had been repeating the exhibit, because it wanted to discredit Fall Line's entire case. DoorDash's offered test confirms it. "You will know me by my deeds" is, as DoorDash said, "a very old expression"—it echoes the Sermon on the Mount, where the test serves one announced purpose: "***Beware of false prophets***, which come to you in sheep's clothing . . . . Ye shall know them by their fruits." Matthew 7:15–16 (King James Version) (emphasis added). Even on its face, DoorDash's test invites the jury to evaluate a party's words by that party's deeds.

That is influence under Rule 103(a), and it landed where it counts. Question 1 on infringement was Fall Line's expert against DoorDash's, and the jury had to decide who to believe. A jury that is told for four days that one party hides evidence, told to "know me by my deeds," and asked whether that party "plead[ed] a righteous case," might discount the party's

[redacted]

witnesses and evidence. All of that depended on DX-209. DoorDash's closing never even tied DX-209 to a specific damages number, because that was not its primary purpose.

How much influence did DX-209 have? Courts often measure influence by counting. In *Magēmā*, the Federal Circuit reversed the denial of a new trial by counting: the improper theory was "raised . . . during opening statements over [the patentee's] objection," raised again "on three cross-examinations," and urged yet again in closing. "[G]iven how many times Phillips urged its 'improper and prejudicial' actual-testing arguments, we have little confidence that those arguments did not affect the outcome of the trial." 153 F.4th at 1259. This Court similarly counted in *VirnetX*, concluding that "repeated statements" eventually "tipped the balance towards unfairly prejudicing Apple." *VirnetX*, 2016 WL 4063802, at *7.

Now count this trial. The exhibit was displayed in opening. Vol. 1 236:21–237:17. The redaction theme was pressed on Fall Line's infringement expert across a set piece spanning eight transcript pages, Vol. 2 484:9–491:12, and again on its damages expert, Vol. 3 637:3–5. The heading was walked through with DoorDash's sponsoring witness on direct. Vol. 3 690:21–691:4. The exhibit returned in DoorDash's own damages case, where Mr. Bakewell rested his "roughly 89 percent" cut on it. Vol. 4 897:1–9. And the closing told the jury the repetition had been deliberate: it was used "a few times during this litigation for a reason." Vol. 4 1022:12–13. The Court cannot say with "fair assurance" that the jury disregarded this deliberately elicited, inadmissible matter, so it should grant a new trial. *Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*, 772 F.3d 1031, 1033–35 (5th Cir. 2014) (affirming grant of new trial where "testimony violated the district court's pre-trial order on a motion in limine" and "left it with no fair assurance that the jury had ignored the inadmissible evidence").

*Cirba* shows how tainted material that carries a party's theme warrants a new trial even

[redacted]

when it could not have supported the verdict itself. Two plaintiffs tried a patent case against VMware; the one with no exclusionary rights, Cirba Inc., was dismissed for lack of standing after the verdict—and then-District Judge Stark granted a new trial on infringement anyway. Its presence had supplied no element of any claim. What it had supplied was the theme: a small competitor facing "the 800-pound gorilla," "fighting for its life"—"themes that Plaintiffs emphasized right from their opening statement." 2020 WL 7489765, at *1–4. Without them, the remaining plaintiff's "case theory and trial presentation would have required a significant shift," and "the outcome of the case could very well have been different"—leaving "too great a chance that the jury's assessment of the infringement and invalidity evidence was swayed by evidence and argument that . . . should not have been permitted." *Id.* at *5. Each piece of *Cirba*'s description fits this trial. The concealment story was DoorDash's central theme, emphasized from its opening statement. *Supra* § II.D. It supplied no element of non-infringement and no claim limitation. And it reached the jury only because DX-209 was admitted on a representation that DoorDash's own evidence disproved. *Supra* § III.B.1. What carried DoorDash's theme should not have been permitted, and the chance that it swayed this verdict is at least as great.

This case also compares favorably to the cases that order new trials based on credibility concerns. In *Swearingen*, for example, the prejudice came from allowing a cold deposition transcript to be read—under circumstances that violated Rule 32(a)—rather than requiring the witness to appear live. Because the outcome turned on credibility, receiving her testimony in a form the jury could never size up for itself required a new trial. 759 F. App'x at 324–26. In *Latiolais* the comparable error was slighter still—one side's witness read his own deposition aloud while the other side's testimony reached the jury in a stranger's voice—and again what mattered was the form's effect on credibility. 93 F.3d at 209–10. Here the error was never a

[redacted]

matter of form: no competent witness ever vouched for what DX-209's heading asserted. *Supra* § III.B.1. Yet the exhibit went to the jury room and was put to work telling the jury whom to disbelieve. If the way that competent testimony is presented can require a new trial because of credibility concerns, an incompetent exhibit built to attack credibility requires one even more.

Credibility is not a fact that can disprove liability. It is a lens used to color everything the jury sees. Every piece of Fall Line's proof—including its evidence that DoorDash infringed—reached this jury through that lens. The verdict cannot be saved by assuming this jury saw through DoorDash's story—"[t]hat was a credibility determination that the jury could have made but we cannot be sure it did, in fact, make." *Magēmā*, 153 F.4th at 1260.

Finally, one feature of this record makes DoorDash's use of DX-209 especially bad. The premise DoorDash argued from DX-209—that a saved-address order shows DoorDash does not infringe, and that Fall Line hid the proof of it— had no competent witness at trial, no fact witness with knowledge of it, and no qualified expert. In fact, DX-209's own sponsor disclaimed it. Asked whether she could tell the jury "that just because a saved address is used, that means DoorDash does not infringe," Ms. Merrigan answered, "I understand what DoorDash's position is, but I'm not the expert to testify." Vol. 3 713:9–13. She told the jury who would supply the premise instead: "DoorDash also has experts that will testify on this point." Vol. 3 712:2–3.

No expert did. ***Dr. Black was never examined about DX-209***. So he never told this jury that the exhibit showed even one non-infringing transaction. The closest DoorDash came was Mr. Bakewell, its damages expert. When asked whether he believed the heading's premise, Mr. Bakewell answered: "In part. I'm relying on the technical experts." Vol. 4 907:16–21. But his report cited only Ms. Merrigan for the premise—"all the footnotes are to Ms. Merrigan"—and, as he agreed, cited no conversations with Dr. Black in support of it anywhere. Vol. 4 908:12–25;

[redacted]

911:19–912:4. Ms. Merrigan, in his words, is "a fact witness, not an expert witness." Vol. 4 911:17–18. And as for the heading's premise—that Location Services are not used when a saved address is—Mr. Bakewell said "I don't know firsthand, no." Vol. 4 912:13–16. He also agreed that an opinion on that question must rest on evidence from experts in the area or fact witnesses with knowledge. Vol. 4 912:17–22. DoorDash offered neither: its fact witness Ms. Merrigan could not defend the premise, and its technical expert Dr. Black was never asked.

DoorDash's closing argued the premise anyway. The redacted data, counsel said, "clearly would have made a difference to [Fall Line's expert's] opinions"—in the same breath as paraphrasing the expert's answer that it would not have. Vol. 4 1022:21–24. In fact, both of Fall Line's experts flatly denied that assertion, one of them on DoorDash's own cross. Vol. 2 487:4–6 ("It did not change my opinion."); Vol. 3 639:17–19 ("Q. . . . [I]t didn't change your analysis? A. No, it did not."). So the argument that shaped how this jury saw Fall Line rested on an inadmissible exhibit, a sponsor who disclaimed its meaning, and a damages expert repeating the sponsor—and a final appeal to the jury that contradicted the only testimony on the point.

*c. The prejudice was compounded because Fall Line was barred from responding to DoorDash's concealment narrative*

What made the accusation based on DX-209's improper admission hit harder was the exclusion of its explanation. That pattern led to a new trial in a recent Federal Circuit case applying Fifth Circuit law. In *Magēmā*, the district court told the plaintiff, "I don't want to hear the words 'Phillips has not produced test results,' " while Phillips argued to the jury that "there was 'no actual test data that shows compliance, none.'" 153 F.4th at 1256. The Federal Circuit reversed the denial of a new trial: the plaintiff "was unable to explain to the jury why it did not have test samples," and the customary instruction that statements of counsel are not evidence "did little to reduce the prejudice resulting from Phillips' gamesmanship." *Id.* at 1259 & n.7.

[redacted]

The argument, the court held, "should have never been argued to the jury," and the patentee had been "denied . . . the opportunity to put in context" the absence being argued. *Id.* at 1256, 1258.

Here, this Court asked the very question the jury was never allowed to hear answered. At the bench, after Fall Line protested that DoorDash had "been pounding us throughout this trial that we have redacted data and did that to hide it from our experts," Vol. 3 705:4–7, the Court asked: "is there an explanation for why that happened? I never have really understood that." Vol. 3 705:8–10. Counsel gave the explanation—the compelled production, the unrequested columns, the objection. Vol. 3 705:11–707:14. The Court asked whether there had been "a discovery dispute on this issue"; told that there was, it went no further: "I'm not going to let you get into that." Vol. 3 707:15–19. Fall Line was doing exactly what the parties' agreement required—discovery-dispute matters were to be raised with the Court first, outside the jury's hearing, and the bench is where Fall Line raised this one. Dkt. 60 at 12.

The agreed MIL did not provide that the jury would hear an accusation but never the explanation. But that was the consequence. DoorDash told the jury the question was undisputed: "it's not disputed that they hid this data from their own expert." Vol. 4 1022:14–15. And it supplied its own explanation for Fall Line's actions: "We know why you redact something, it's because you don't want someone to see it." Vol. 4 1022:20–21. The jury never heard what the Court itself had asked to hear: Fall Line's own explanation for the redaction.

***3. Fall Line preserved its objection to DX-209***

A timely objection preserves error if it "states the specific ground, unless it was apparent from the context." Fed. R. Evid. 103(a)(1)(B). Fall Line "objected to this exhibit on hearsay grounds," adding that "a business records exception . . . hasn't been proven up." Vol. 1 169:10–18. The objection was timely made "[o]n the first day of trial" before evidence was heard. *Magēmā*, 153 F.4th at 1257. The Court ruled definitively: "I'm going to overrule the objection

[redacted]

on that." Vol. 1 170:4–5. After that "[t]here would be no point in objecting again." *Magēmā*, 153 F.4th at 1257 (holding that similarly made objection "was properly preserved").

Nothing Fall Line did afterward waived the objection. An objecting party "is entitled to rely upon the trial judge's ruling as the law of the case," and neither cross-examining about the admitted evidence nor introducing rebutting material waives it. *United States v. Marshall*, 762 F.2d 419, 424–25 (5th Cir. 1985) (reversing and remanding for a new trial). Fall Line's later uses of the fuller DX-208 were responsive uses that accepted for trial purposes the data while contesting the label. Vol. 3 699:9–11; Vol. 4 917:23–918:14.

### C. The Improper Admission Of Mr. Rowan's "Customized" Testimony Warrants A New Trial

The same three showings govern this ground—error, prejudice, and a timely objection. *Supra* § III.B. But the error here is of a different order: DoorDash used testimony that this Court had precluded it from using. Fed. R. Evid. 103(a); *Cruz*, 96 F.4th at 814; *Magēmā*, 153 F.4th at 1258–59. The testimony at issue is Mr. Rowan's statement, from his barred Rule 30(b)(1) deposition, that the DoorDash app "can be used anywhere and is not customized for any particular location"—the exchange that the jury heard twice and that DoorDash's closing called "Mr. Jon Rowan admitting non-infringement on the customize term." Vol. 4 1034:15–16.

#### ***1. Mr. Rowan's testimony about "customized for a particular location" was improperly admitted***

The Court barred DoorDash from using Mr. Rowan's Rule 30(b)(1) testimony, and the "customized" exchange was Rule 30(b)(1) testimony. Even if it were not, two independent grounds each made it inadmissible: it contradicted the claim construction—indeed, it was substantively identical to Dr. Black's stricken opinions—and it was improper lay testimony.

##### *a. The Court precluded DoorDash's use of Mr. Rowan's Rule 30(b)(1) testimony*

Rule 32(a)(5)(A)'s prohibition, this Court held, "provides no room for discretion," so

[redacted]

"the DoorDash Defendants are barred from using Mr. Rowan's Rule 30(b)(1) deposition against Plaintiff." Lead Dkt. 384 at 2, 5. The trial framework followed the order: "we allowed the 30(b)(6) testimony but not the 30(b)(1) testimony." Vol. 2 499:2–4. So the first question this ground turns on is a narrow one: was the "customized" exchange Rule 30(b)(6) testimony on behalf of Fall Line, or Mr. Rowan's own personal opinion?

*b. Mr. Rowan's "customized" exchange was Rule 30(b)(1) testimony*

The exchange itself shows whose testimony it was:

> Q ***And from your use of the DoorDash app, is it fair to say*** that the DoorDash app can be used anywhere and is not customized for any particular location?
>
> MR. ANTONELLI: I'm going to object to that question as -- to the form of the question as beyond the scope of the 30(b)(6) deposition.
>
> A Could you ***read me the question one more time***?
>
> Q (By Mr. Rueckheim) ***Sure. Isn't it fair to say*** that the DoorDash app can be used anywhere and is not customized for any particular location?
>
> MR. ANTONELLI: I'm going to object to the form of that question. I'm going to object that it's beyond the scope of the 30(b)(6) deposition topics.
>
> A ***Yes. I think that would be fair to say.***

Rowan Dep. 96:6–21 (emphasis added). The record shows that this answer was Mr. Rowan's own opinion rather than Fall Line's Rule 30(b)(6) testimony for three reasons.

***First,*** no noticed topic called for Fall Line's opinions about claim language divorced from the Court's constructions. The closest topic proves the point. Topic No. 45 sought "Plaintiff's allegations of infringement in the Current Litigation," through the Complaint and the Infringement Contentions; the question DoorDash played sought the reverse—DoorDash's non-infringement conclusion, in claim vocabulary tied to nothing. Lead Dkt. 306-3 [Rowan Dep. Ex. 4], Topic No. 45. A question that seeks the opposite of the noticed subject is not within the

[redacted]

notice, and testimony beyond the noticed topics "constitutes the testimony of the designee *in an individual capacity* and not on behalf of the entity." *Goodyear Tire & Rubber Co. v. CEVA Logistics Singapore, Ltd.*, 348 F.R.D. 54, 73 (E.D. La. 2024) (emphasis in original). Topic No. 46 was the same subject in mirror image—Fall Line's contentions that DoorDash's services embody the claims—not DoorDash's opinions that they do not.

The transcript's own architecture says as much: the exchange interrupted the examination on Topic 59 (a valuation topic for damages), and the examiner's next words after the answer were, "So we can go back to -- I think you were reading your notes from Topic 59; is that correct?" Rowan Dep. 88:15–90:22; 96:22–97:4. DoorDash's counsel treated the "customized" questions as the detour they were—and he never accepted the invitation to "clarify whether you're trying to take 30(b)(6) testimony or 30(b)(1) testimony." Rowan Dep. 9:10–16.

***Second***, the question called for a personal opinion, and the context confirms the exchange's personal character. The question capped a personal-use line—had Mr. Rowan "used the McDonald's app?" He had, "one time," some "three years" earlier. Rowan Dep. 95:11–13; 96:1–5. Then came "And from your use of the DoorDash app"—the connective "And" chaining the question to the personal sequence—followed by the capacity objection, Mr. Rowan's request to hear "the question" again, and a restatement with the personal-use clause silently dropped. Rowan Dep. 96:6–16. DoorDash's counsel told this Court why the clause disappeared: "I changed it because they objected to his personal use." Vol. 2 499:11–19. But a personal question, objected to as personal, does not become the company's testimony because its agreed restatement omits the words that gave the game away. And the answer—"I think that would be fair to say"—from a witness who does not even have the DoorDash app, Rowan Dep. 16:5–6—was obviously not Fall Line contradicting its own infringement case.

[redacted]

***Third,*** Mr. Rowan himself drew the capacity line all day, before and after this exchange. When he understood a question to seek Fall Line's positions, he answered the way a company answers. Asked what Fall Line contends the DoorDash app collects as survey data, he answered for the company and pointed to its professionals: "[w]e rely upon the opinions of our counsel to tell us that. We rely upon the experts to tell us that." Rowan Dep. 22:10–23:18. Asked on Topic 68 about non-infringing alternatives, he answered that "Fall Line is not aware of any"—and when the follow-up sought his personal agreement that "the claim requires sending information from a GPS receiver," he refused outright: "I would rely on a claim construction prepared by my counsel or an opinion from my expert as to what—what the claim means or doesn't mean." Rowan Dep. 99:17–100:10. By comparison, the "customized" exchange was a distinct detour into his personal views, not a statement of Fall Line's infringement position.

If there is any doubt whether the "customized" exchange was Mr. Rowan's own, it should be resolved against DoorDash. It was DoorDash's burden to show that what it played was the corporation's testimony, under a rule this Court has held allows no discretion. *Supra* § III.C.1.a. And Rule 32(a)(5)(A)'s shield does not turn on events the examining party controls: a party who promptly moves for it—as Fall Line did—is "spared the risks" of a deposition taken before the court can rule. *See* Fed. R. Civ. P. 32 advisory committee's note to 1993 amendment. Those risks belong to DoorDash, which chose to go forward on short notice and never designated the 'customized' questioning as corporate testimony—even though it tied other questions to the notice when pressed. Rowan Dep. 8:25–9:16; 17:7–13.

*c. Even if the exchange were Rule 30(b)(6) testimony, it still contradicted the Court's claim construction and was an improper lay opinion*

Even if Mr. Rowan's "customized" exchange were Rule 30(b)(6) testimony, it still should not have been used for two reasons.

[redacted]

**Contradicts Claim Construction.** First, the answer contradicts the Court's claim construction—and in the same way the Court had already held when striking Dr. Black's similar opinions. "Once a district court has construed the relevant claim terms . . . that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury." Lead Dkt. 507 at 12 (quoting *Exergen*, 575 F.3d at 1321). The Court construed "customized for a particular location" to mean "customized for a particular location known prior to collecting any responses from the user." Lead Dkt. 329 at 36. Yet the Rowan testimony swaps the Court's construction for a different test: whether the app "can be used anywhere." But that test says nothing about whether the questionnaire is customized for a location known prior to collecting any responses. *See Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*, 127 F.4th 1340, 1349–50 (Fed. Cir. 2025) (explaining that non-infringement testimony is "unreliable under [FRE] 702" when it is "untethered from the district court's claim constructions"); *Ultravision Techs., LLC v. GoVision LLC,* No. 2:18-CV-100-JRG-RSP, 2021 WL 2144788, at *2 (E.D. Tex. May 26, 2021) ("Incorrect claim construction statements go to the relevance of the expert's opinion. . . .") (citing *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (affirming exclusion of expert testimony based on an impermissible claim construction)).

In fact, this Court excluded the same opinion before. Dr. Black's report said that the accused "questionnaire" is not "customized for a particular location" because "[t]he address or location that the user may select or identify . . . ***is not limited to any particular address or location***," which was "in contrast to the two embodiments of the 748 Patent—i.e., the mystery shopper and the medical service provider (MSP)." Lead Dkt. 377-1 ¶¶ 232–35 (emphasis added). The Court ruled that "Dr. Black's opinions in paragraphs 232–37 impermissibly compare[] the preferred mystery shopper embodiment to the accused application to show non-

[redacted]

infringement." Lead Dkt. 507 at 51–54 ("Paragraphs 232–37 are excluded."); Lead Dkt. 377 at 7–8 (moving to strike). Mr. Rowan's answer is Dr. Black's argument stated conclusorily: the app "can be used anywhere," so it is not customized for any "particular" location. What the Court barred DoorDash's retained expert from arguing—with every safeguard of expert discovery, disclosure, and *Daubert* behind him—cannot arrive through a lay deposition instead.

The deposition shows another way that Mr. Rowan's lay opinions about "customized for a particular location" overlap with Dr. Black's excluded opinions. In the personal-use line that led to the exchange, Mr. Rowan agreed the McDonald's app is "customized for McDonald's stores" because "[t]he McDonald's app will only buy you a hamburger at McDonald's." Rowan Dep. 95:14–19. So to Mr. Rowan, the "customized" phrase meant tied to a brand. But the Court struck that same view from Dr. Black's report as "improper claim construction." Lead Dkt. 507 at 54 (rejecting theory that "a questionnaire customized for more than one restaurant cannot meet the 'particular location' limitation" and striking Lead Dkt. 377-1 ¶¶ 423–29). The Court excluded Mr. Rowan's McDonald's comparison itself—"[t]his case is not about the McDonald's app." Vol. 3 721:10–18. But the answer built on the same wrong view of "customized" came in.

**Improper Lay Opinion.** Second, only a qualified expert may apply a construed claim term to an accused system for infringement purposes, and Mr. Rowan is not one. "[I]t is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art." *HVLPO2, LLC v. Oxygen Frog, LLC*, 949 F.3d 685, 688–89 (Fed. Cir. 2020) (quoting *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008)). Mr. Rowan is a corporate lawyer with no technical knowledge of DoorDash's systems, testifying before the *Markman* order issued. An unqualified witness like Mr. Rowan may not opine on the ultimate question at all, especially

[redacted]

without applying the Court's claim constructions: such testimony "serves only to cause mischief and confuse the factfinder." *Sundance*, 550 F.3d at 1361–64 (holding that testimony from a witness "lacking the relevant technical expertise fails the standard of admissibility under [FRE] 702"); *see also SSL Servs., LLC v. Citrix Sys., Inc.*, 940 F. Supp. 2d 480, 500 (E.D. Tex. 2013) (excluding fact-witness infringement opinion as "significantly prejudicial" where "rendered *without* regard for how this Court has construed the claims") (italics in original).

These rules apply with full force to Rule 30(b)(6) testimony. Rule 30(b)(6) is a discovery device—it does not determine whether the designee's testimony satisfies the evidentiary rules for trial. A designee's deposition may be used at trial only "to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying." Fed. R. Civ. P. 32(a)(1)(B). So "a Rule 30(b)(6) witness does not have license, without more, to opine as an expert," and passing specialized opinion through a designee is "a calculated and troubling end-run around Rule 702 and *Daubert*." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 266 (5th Cir. 2022) (reversing and remanding for new trial). Witness testimony that would be inadmissible from the witness stand—*e.g.*, testimony that contradicts the Court's construction—does not become admissible because the deposition notice bore a company's name.

***2. Admitting Rowan's "customized" testimony was prejudicial, and DoorDash's closing made sure of it***

If the Court finds that Mr. Rowan's testimony was improperly admitted, a finding of prejudice should invariably follow. Given the general verdict form, prejudice is established by DoorDash's reliance on the tainted material to argue non-infringement. Where "the general verdict form does not indicate the basis for the jury's decision" and "the evidence shows that [the proponent] relied on [the improper theory] for its argument that it does not infringe the asserted claims," the movant "has established that it was prejudiced." *Network-1 Techs., Inc. v. Hewlett-*

[redacted]

*Packard Co.*, 981 F.3d 1015, 1025–26 (Fed. Cir. 2020); *see also Magēmā*, 153 F.4th at 1258–59 (citing *Network-1*, 981 F.3d at 1025, and holding that "we cannot be sure the error did not influence the jury" where "the jury could have . . . believed" the tainted theory that defendant "repeatedly urged."). And the Fifth Circuit has found prejudicial error based on admitting deposition testimony in violation of Rule 32(a), like with Mr. Rowan's testimony here. *See Jauch v. Corley*, 830 F.2d 47, 50 (5th Cir. 1987); *Swearingen*, 759 F. App'x at 324.

DoorDash's closing left no doubt that admitting the Rowan testimony was prejudicial. Its closing walked the jury through the direct-infringement instruction and then said: "I think Mr. Rueckheim, my partner, showed you multiple ways how they did not meet their burden. You can pick any of them. It doesn't need to be all of them. It can just be one." Vol. 4 1045:6–9. One of the offered ways was "customized for a particular location," and its anchor was the barred exchange: "You know who else testified about customized for a particular location? Mr. Jon Rowan." Vol. 4 1027:2–3. DoorDash then named the exchange for what it wanted the jury to make of it: "***Mr. Jon Rowan admitting non-infringement on the customize term***." Vol. 4 1034:15–16 (emphasis added); *see also* Vol. 4 1027:2–1028:6. That is the *Network-1* showing, in DoorDash's own words. Nothing more is required.

The weight DoorDash placed on the exchange confirms the reliance. It told the jury the answer was "binding on Fall Line," Vol. 2 500:6–9, and repeated it in closing: "this is binding on the corporation." Vol. 4 1027:6–8. DoorDash asked Dr. Black to recite the exchange in his direct examination. Vol. 3 759:1–19. DoorDash even embellished the answer in its closing: it quoted Mr. Rowan as saying "***Honestly***, yeah, I think that's fair to say," Vol. 4 1027:17–18, when the answer in the record is "Yes. I think that would be fair to say." Rowan Dep. 96:21. And DoorDash summed up its argument here by saying: "the only explanation is he was telling

[redacted]

the truth." Vol. 4 1028:4–6. So the argument DoorDash pressed hardest on the "customized" limitation—the one it said was "binding"—hinged on the inadmissible Rowan testimony.

It is immaterial that DoorDash introduced other evidence about the customized term, because the jury was free to find that the term was still met. An available alternative is "a credibility determination that the jury could have made but we cannot be sure it did, in fact, make." *Magēmā*, 153 F.4th at 1260. Here, this Court has twice held that a jury would not have to find non-infringement on the "customized" term. Lead Dkt. 507 at 19–21, 31 (rejecting defendant's arguments on step (a) and denying summary judgment of no direct infringement for DDI); Vol. 1 154:23–157:21; Vol. 2 263:10–264:17 (denying reconsideration).

The jury did not have to resolve the conflict in the parties' other evidence on the "customized" term in favor of DoorDash. The only non-conclusory testimony Dr. Black gave on this term was that the DoorDash login screen "is not customized for any particular location" because it looks "the same regardless of where you're sitting at the time you log in." Vol. 3 758:22–25. But that was contradicted by Dr. Russ's opinions, and Fall Line's other evidence, about why the questionnaires transmitted by DoorDash's servers are customized. *See, e.g.*, Vol. 2 377:20–379:23 (Dr. Russ testifying that the questionnaires are customized for a location known before any responses are collected), 382:1–22 (Dr. Russ agreeing that questions are customized by DoorDash); Vol. 2 379:24–380:14 (Dr. Russ citing Ms. Narla's testimony); Vol. 3 562:25–563:24 (Ms. Narla's testimony that "the homepage is personalized based on the location"); Vol. 3 557:12–18 ("the home screen is loaded with merchants available in that region").

Nor could an instruction have cured the prejudice from Mr. Rowan's "customized" testimony. A limiting instruction given before the deposition video played did not save the verdict in *HVLPO2*: the Federal Circuit reversed anyway. 949 F.3d at 687–90 (reversing the

[redacted]

denial of a new trial). And an instruction is "insufficient to cure the prejudice" where counsel's closing converts factual testimony into an unsworn non-infringement opinion "that completely ignored the claim construction exercise." *Intellectual Ventures I LLC v. Canon Inc.*, 104 F. Supp. 3d 629, 659 (D. Del. 2015) (granting a new trial). DoorDash's closing did precisely that. It converted a barred, embellished, personal-capacity answer into "Mr. Jon Rowan admitting non-infringement." Vol. 4 1034:15. On this record, no one can be reasonably certain that the non-infringement verdict was unaffected.

### *3. Fall Line preserved its objections to Mr. Rowan's "customized" testimony*

Fall Line repeatedly objected to Mr. Rowan's "customized" testimony. After opening statements and before testimony was played the next day, Fall Line objected in writing under the Court's designation-dispute procedure. Dkt. 65 at 16–17. Fall Line orally objected when DoorDash cross-examined Dr. Russ about this testimony. Vol. 2 497:19–500:5. And Fall Line again orally objected before DoorDash played its designations from the Rowan deposition on day three. Vol. 3 718:19–723:22; 724:14–725:14.

Fall Line's objections preserved every argument here: FRE "401/402/403" and "Improper expert opinion (FRE 701/702)," Dkt. 65 at 16–17—and FRE 701(c) bars lay opinions "based on scientific, technical, or other specialized knowledge within the scope of Rule 702"—as well as Motion in Limine No. 7, which barred non-infringement argument by improper comparisons to preferred embodiments, opinions that disregard the Court's constructions. Dkt. 60 at 6–7. The Court even invoked that principle in striking Dr. Black's similar opinion. Lead Dkt. 507 at 53–54. So Fall Line gave ample notice, in writing and before playback, of its objections.[2]

[2] *See also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("***We further decline to find waiver against SAAT in view of Exergen's misleading statement*** to the jury that 'an oral temperature is an internal temperature' in the context of a forehead

[redacted]

The Court ruled definitively against Fall Line—twice—and brought the argument to a close. Vol. 2 497:19–500:5; Vol. 3 720:13–723:22. Nothing more was required. Fed. R. Evid. 103(b); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 & n.16 (5th Cir. 2002).[3]

**D. DoorDash Attacked Fall Line's Credibility In Other Improper Ways**

An erroneous evidentiary ruling requires a new trial unless the Court "is sure, after reviewing the *entire* record, that the error did not influence the jury." *Cruz*, 96 F.4th at 814 (italics in original). Nor does the assessment turn on an episode-by-episode objection: where closing argument seriously affects the fairness of the proceeding, relief is available even as to remarks that drew no objection, and argument is assessed "as a whole." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 276–78 (5th Cir. 1998); *see also Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1370 (Fed. Cir. 2013) (applying Fifth Circuit law), *vacated in part on other grounds*, 575 U.S. 632 (2015); *Clapper v. American Realty Investors, Inc.*, 95 F.4th 309, 314, 318–19 n.2 (5th Cir. 2024).

This section addresses two additional closing arguments. Fall Line does not present them as independent grounds for a new trial; they are part of the entire record the Court reviews before it can be sure that neither error above influenced the jury. And both pressed the same attack the tainted evidence served: urging the jury to distrust Fall Line itself, not merely its proof.

First, DoorDash argued the absence of pre-suit notice after the Court had removed notice from the case. DoorDash had elicited the subject itself: it asked Fall Line's owner, James

---

thermometer—***a statement that directly contradicts the district court's earlier construction*** of 'internal temperature.'") (emphasis added).

[3] *See also United States v. Rodriguez-Leos*, 953 F.3d 320, 326 (5th Cir. 2020) ("once a party raises an objection in writing, if he subsequently fails to lodge an oral on-the-record objection, the error is nevertheless preserved"); *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 387–88 n.19 (5th Cir. 2004) (holding that a pretrial objection has "particular force when the trial court makes clear that it does not wish to hear further argument").

[redacted]

McGill, whether he had "contact[ed] DoorDash before suing to ask whether they want a license." Vol. 2 307:16–19. The Court then instructed the jury—resolving a disputed instruction in Fall Line's favor at the charge conference, Vol. 4 850:11–19—that "[t]he law does not require a patent owner asserting a method claim to give notice of the patent or of infringement before filing suit," and that "[t]he presence or the absence of pre-suit notice is not relevant to infringement or to the amount of damages." Dkt. 82 at 12; Vol. 4 981:13–18 (as read). An hour later, DoorDash's closing pressed the argument anyway—there was "no explanation as to why when this patent issued in 2017 they waited until 2024 to sue us out of the blue"—and re-read Mr. McGill's license answer to the jury. Vol. 4 1024:2–4, 12–18. The argument's target was not the damages number; it was Fall Line's character. The plaintiff that supposedly waited seven years to sue "out of the blue" was the same plaintiff the jury had heard accused, for four days, of hiding data from its own experts.

Second, DoorDash argued laches in everything but name: "what, it's seven years, eight years, and they just slept on their rights." Vol. 4 1024:10–11. "Slept on their rights" is the vocabulary of laches—an equitable defense the parties had agreed, and the Court had ordered, would not be put to this jury. Dkt. 60 (Agreed MIL #5). So the argument crossed two lines at once: the charge that had just made the subject irrelevant, and the parties' own bargain that kept equitable defenses from this jury. Like the notice argument, this one asked the jury to judge Fall Line's character rather than weigh its evidence—one more push toward wholesale distrust, delivered an hour after the charge. These improper and unjustifiable arguments are added reasons to find that substantial justice supports a new trial. *Clapper*, 95 F.4th at 314, 318–19 n.2.

Both episodes returned to ground this Court had closed, and both aimed where the tainted evidence aimed: at Fall Line's credibility. That heightens the prejudice of each error

[redacted]

independently, whichever way the Court resolves the other. A jury urged to distrust Fall Line wholesale was less likely to discount the concealment accusation built on DX-209, and less likely to make the credibility determination that remained available on the "customized" term. *Supra* §§ III.B.2, III.C.2. Nor were these the closing's only departures from the record: it also altered a quotation of Mr. Rowan's answer, *supra* § III.C.2, and attributed to Dr. Russ enablement testimony no witness gave, *infra* § IV.B—so the verdict cannot be traced instead to the enablement defense. Taken together, these episodes add to why no one can be "reasonably certain" that this verdict rests on the admissible evidence and proper arguments alone. *Muth*, 461 F.3d at 564–65; *Magēmā*, 153 F.4th at 1259 ("We cannot tell why the jury answered 'no.'").

## IV. FALL LINE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON ENABLEMENT UNDER RULE 50(b)

The grounds above concern what materials reached the jury that should not have. But what never reached the jury at all is any evidence that could carry DoorDash's clear-and-convincing burden on enablement. Fall Line's motion is renewed, and it is not conditional: Rule 50(b) lets the Court "direct the entry of judgment as a matter of law" even on a question the jury did not reach. And judgment against this defense limits any retrial to infringement and damages—the only issues that were in genuine dispute between the parties.

### A. Judgment As A Matter Of Law Is Required When No Reasonable Jury Could Find Invalidity, Even If The Jury Did Not Reach That Question

Rule 50 measures what DoorDash actually put before the jury. Judgment as a matter of law is proper when "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue." Fed. R. Civ. P. 50(a)(1), (b). The post-verdict standard "is precisely the same as the standard for granting the pre-submission motion under Rule 50(a)." *Kilchrist v. Sika Corp.*, No. 3:10-CV-2567-B, 2012 WL 3599383, at *4 (N.D. Tex. Aug. 22, 2012), *aff'd*, 555 F. App'x 350 (5th Cir. 2014). Fall Line moved at the close of the evidence,

[redacted]

pointing out DoorDash's lack of any expert enablement opinion applying the *Wands* factors; DoorDash cross-moved for judgment of invalidity. Vol. 4 952:19–953:15; 953:22–24. The Court carried both motions, noting that renewal under Rule 50(b) would allow "a more careful scrutiny of the record." Vol. 4 960:22–23; 961:22–962:8.

It does not matter that the jury, following the verdict form's instructions, never reached invalidity. The movant is "entitled to have a final determination" of its renewed motion, *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1584 (Fed. Cir. 1995), and Rule 50(b) "does not give the district court a fourth option of simply declining to hear the motion." *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 954 (Fed. Cir. 1997). And where the challenger's proof fails, the Court may take enablement from the jury and enter judgment for the patentee. *See Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1291–92 (Fed. Cir. 2012) (affirming judgment as a matter of law for the patentee on enablement where "[i]mportantly, there was no testimony from which a jury could find that using true reticulocytes would require 'undue experimentation'"); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1114 (Fed. Cir. 1996) ("There is no automatic entitlement to a new trial of validity because infringement must be retried.").

### B. No Reasonable Jury Could Find That DoorDash Proved Its Enablement Defense By Clear And Convincing Evidence

Enablement is measured by a standard that this Court has already stated in this case. *See* Lead Dkt. 507 at 47–48. A specification must teach those skilled in the art how to make and use the full scope of the claimed invention without "undue experimentation." *Trs. of Boston Univ. v. Everlight Elecs.* Co., 896 F.3d 1357, 1362 (Fed. Cir. 2018). "The key word is 'undue,' not 'experimentation.'" *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). Experimentation is undue where a skilled artisan must engage in "elaborate" or "painstaking experimentation." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610, 614 (2023). And the question requires weighing the eight *Wands*

[redacted]

factors, which is a fact-intensive inquiry. *See Wands*, 858 F.2d at 737. Because the patent is presumed valid, lack of enablement must be proven by clear and convincing evidence—a burden that is the challenger's "throughout the litigation." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1337 (Fed. Cir. 2013) (reversing a judgment of nonenablement where the challenger's proof failed).

All the evidence DoorDash has ever identified for this defense comes down to two items, and this Court has already held that they cannot carry DoorDash's burden. *Supra* § II.G; Lead Dkt. 507 at 48–49. Trial did not add a third. When asked at the Rule 50(a) argument what the defense rested on, DoorDash named the same two items. Vol. 4 954:7–23.

Neither item left the trial in better shape than it entered. The first item is the 748 patent itself. DoorDash cited the same snippets from the patent that it cited when moving for summary judgment: 5:42–48 and 10:55–58. *Compare* Vol. 4 955:15–21, *with* Lead Dkt. 378 at 28. Attorney argument about what a specification does not say was insufficient at summary judgment "given that patents are 'presumed valid.'" Lead Dkt. 507 at 49 (citing 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 102 (2011)). It did not become better evidence by being argued again on Rule 50(a) motions.

The second item is the same sentence from Dr. Russ's rebuttal report, which appeared at trial as Dr. Russ agreeing he had said a feature was "not something that was known at the time." Vol. 2 492:17–493:4. This Court has already held that it "in no way means that a person of skill in the art would not have been able to make and use it without undue experimentation." Lead Dkt. 507 at 48 (quoting Lead Dkt. 396 at 18). And Dr. Russ himself explained on cross that the opinion addressed eligibility—"routine and conventional, not enablement," Vol. 2 493:1–4—that he had no enablement opinion "because Dr. Black did not" offer one, Vol. 2 493:9–10, and that

[redacted]

DoorDash was "asking me to create new opinions here in court." Vol. 2 494:3–6; *supra* § II.G.

DoorDash's response? It turned Dr. Russ's statement about what was not "known at the time" into a new point entirely—"So he said: The person of skill would not know ***how to do*** this." Vol. 4 1041:4–5 (emphasis added). Walking through the verdict form later, DoorDash doubled down: Dr. Russ "gave an opinion that the patent itself doesn't teach this. He wouldn't know ***how to do*** it. The inventor wouldn't know ***how to do*** it." Vol. 4 1046:12–14 (emphasis added). None of that was said in this trial.[4] DoorDash cannot survive judgment as a matter of law using words that witnesses did not say—even though that is how it sought a verdict.

What this defense has never had is a witness. This Court found at summary judgment that "Defendants have not addressed any of the *Wands* factors." Lead Dkt. 507 at 48. The trial record is no better. Dr. Black took the stand and was asked nothing about enablement, as DoorDash's closing conceded. Vol. 4 1040:21–24. Fall Line said so in the Rule 50(a) argument, without contradiction. Vol. 4 952:19–953:15. No witness addressed a single *Wands* factor.

A challenger that never reaches undue experimentation has not made the required showing. *Supra* § IV.A; *see, e.g.*, *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1155–56 (Fed. Cir. 2004) ("In the present case, Koito simply did not provide evidence at trial that the production details omitted [by the patent] would have made one of ordinary skill in the art unable to practice the claimed invention without undue experimentation.").

At the Rule 50(a) argument, DoorDash traded *Automotive Technologies*—the case it

[4] Nor had the inventor said it. Even putting aside Fall Line's objections to using the unreliable and hearsay Payne document—the Court allowed it on cross-examination only "for purposes of impeachment," Vol. 2 437:17–438:24—the words read to the jury were that Mr. Payne "never used the GPS while developing his patent" and "was not very familiar with GPS at the time." Vol. 2 495:19–21. Never having used something is not the same as being unable to use it. And it certainly is not the same as needing undue experimentation to use it. *See* Lead Dkt. 507 at 48.

[redacted]

relied on at summary judgment, Lead Dkt. 378 at 27–28—for *Mondis*. It told the Court that the facts here "track the *Mondis v. LG Electronics* case . . . fairly closely"—a patent invalid on its face, an expert "admitt[ing] that this element is not known at the time," a patentee that "chose not to present a rebuttal case." Vol. 4 953:25–954:19. The Court reserved consideration of *Mondis* for this motion: "I need to look at that case." Vol. 4 962:3–8.

What the Court will find is this: *Mondis* is a ***written-description*** case. Its holding is that two claims are "invalid for lack of an adequate written description," *Mondis Tech. Ltd. v. LG Elecs. Inc.*, 149 F.4th 1291, 1302 (Fed. Cir. 2025), performing an "objective inquiry into the four corners of the specification." *Id.* at 1299 (quoting *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)). The analysis in *Mondis* says nothing about enablement. A lack of written description can sometimes be shown from the patent's face, "unless there is contrary evidence," because written description is measured within the patent's four corners. *Mondis*, 149 F.4th at 1297-99. Enablement is not so limited. What a specification omits does not defeat enablement absent evidence proving that practicing the invention without the omitted details would require undue experimentation. *See Cephalon*, 707 F.3d at 1337–40 & n.11 (reversing a judgment of non-enablement despite findings about the specification's "lack of direction or guidance (on co-administration) in the patent or the absence of working examples," because the record still lacked evidence of undue experimentation); *Koito*, 381 F.3d at 1155–56.

Nor does this record resemble the one *Mondis* reviewed. There, the patentee's own expert conceded the operative four-corners fact and the patentee "neither redirected [him] on his testimony . . . nor called him in rebuttal," so the concession stood unexplained. 149 F.4th at 1299, 1301. Dr. Russ conceded no fact that enablement turns on. His sentence was a statement about novelty, offered to rebut an opinion about eligibility. Lead Dkt. 507 at 48. Unlike the

[redacted]

plaintiff's expert's concession in *Mondis*, Dr. Russ explained the context of his statement the moment DoorDash raised it. Vol. 2 493:1–4 ("That has to do with routine and conventional, not enablement."). And the lack of a rebuttal case was especially notable in *Mondis* because the challenger presented expert testimony on the defense. 149 F.4th at 1298. DoorDash did not.

DoorDash's conduct during the charging process shows that it knew its case was faulty. On the morning of the day that its expert would take the stand with no possible enablement opinion, DoorDash circulated a redline deleting all the *Wands* factors from the AIPLA-based enablement instruction that DoorDash itself had proposed, along with the instruction that a need for some experimentation does not show a lack of enablement. Ex. 2 [July 29 email]; Ex. 3 [DoorDash's redline] at 19; Dkt. 68 at 15–16 (7/27/26 DoorDash instructions with *Wands* factors); *supra* § II.G. By the evening charge conference DoorDash had abandoned the deletion, Vol. 3 836:2–11, and the jury was instructed on the factors. Dkt. 82 at 14–15; Vol. 4 984:13–25. A party holding legally sufficient evidence on even one *Wands* factor has no reason to ask that the factors be deleted. No team hides the scorecard if it has a chance of winning the match.

The emptiness was not an accident of trial presentation. DoorDash never developed this defense. Its invalidity contentions listed eight claim terms under section 112—but not "GPS integral thereto." Lead Dkt. 396-4 at 23–24. Its interrogatory response on the basis for each affirmative defense disclosed no enablement theory. Lead Dkt. 396-6 at 44–46. No rebuttal or supplemental report followed before expert discovery closed. The defense's only articulated theory appeared for the first time in DoorDash's summary-judgment motion. Lead Dkt. 378 at 27–28. It is no surprise that a defense built this way arrives at trial with nothing behind it.

[redacted]

## V. CONCLUSION

Fall Line respectfully requests that the Court vacate the verdict and order a new trial; that the Court grant judgment as a matter of law on DoorDash's enablement defense and confine any retrial accordingly; and that the Court grant any other relief that is just.

Dated: September 3, 2026

Respectfully submitted,

*/s/ Larry D. Thompson, Jr.*
Matthew J. Antonelli (lead counsel)
Texas Bar No. 24068432
matt@ahtlawfirm.com
Zachariah S. Harrington
Texas Bar No. 24057886
zac@ahtlawfirm.com
Larry D. Thompson, Jr.
Texas Bar No. 24051428
larry@ahtlawfirm.com
Rehan M. Safiullah
Texas Bar No. 24066017
rehan@ahtlawfirm.com
**ANTONELLI, HARRINGTON & THOMPSON LLP**
4306 Yoakum Blvd., Ste. 450
Houston, TX 77006
(713) 581-3000
(713) 581-3020 fax

Elizabeth L. DeRieux
**CAPSHAW DERIEUX, LLP**
114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: 903-845-5770
ederieux@capshawlaw.com

*Attorneys for Fall Line Patents LLC*

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of September 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Larry D. Thompson, Jr.*
Larry D. Thompson, Jr.

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that I am authorized to file the foregoing under seal because it contains information designated as confidential under the terms of the protective order entered by the Court.

*/s/ Larry D. Thompson, Jr.*
Larry D. Thompson, Jr.